**JUDGE COTE**   **09 CV 2646**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :
    :
                         Plaintiff,    :
    :
                v.    :
    :
ESCALA GROUP, INC.,    :
GREGORY MANNING,    :
LARRY LEE CRAWFORD, CPA,    :
    :
    :
                         Defendants.    :

------------------------------------------------------------------------x



09 Civ.

RECEIVED
MAR 2 3 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC"), for its Complaint against Escala Group, Inc., ("Escala"), Gregory Manning ("Manning") and Larry Lee Crawford ("Crawford"), alleges that:

## NATURE OF THE ACTION

1.      This is a disclosure and accounting fraud case that concerns fraudulent related party transactions between Escala, then a Nasdaq-listed company in the collectibles market, and its parent company, Afinsa Bienes Tangibles, S.A. ("Afinsa"), a privately held Spanish company that sold investments in portfolios of stamps in Europe, in connection with sales that became part of what Spanish criminal authorities have called a ponzi or pyramid scheme. In a fraudulent business scheme based upon the secret and dramatic manipulation of collectible stamp values, Escala and its former CEO, Manning, violated the antifraud and reporting provisions of the Exchange Act by: (1) failing to disclose the related party status of Barrett & Worthen, Inc., resulting in control

of the Brookman Catalogue and failing to disclose the revenues obtained by virtue of Afinsa and Manning's control of the prices in the Brookman Catalogue; (2) falsely representing that Escala sold Afinsa several large stamp archives at prices determined by reference to independent stamp catalogues and appraisals when in fact Manning set the catalogue prices and influenced and edited the appraisals; (3) selling back to Afinsa in a round-trip transaction inventory acquired from Afinsa in direct contravention of Escala's public promise not to do so; and (4) falsely reporting a payment for business combination-related expenses as the "sale" of certain antiques. Escala's former CFO Crawford likewise violated the antifraud and reporting provisions of the federal securities laws by: (1) failing to disclose the related party status of Barrett & Worthen, Inc., resulting in control of the Brookman Catalogue and failing to disclose the revenues obtained by virtue of Afinsa and Manning's control of the prices in the Brookman Catalogue; (2) falsely representing that Escala sold Afinsa several large stamp archives at prices determined by reference to independent stamp catalogues and appraisals when in fact Manning set the catalogue prices and influenced and edited the appraisals; and (3) improperly booking the sale of the antiques.

2. These false and misleading disclosures and omissions were material. The related-party transactions contributed over $80 million to Escala's revenues and allowed Escala to meet its forecasts for either revenue or pre-tax net income for the third quarter and for year-end of fiscal year 2004, and for the first quarter and year-end in fiscal 2005. As a result of these transactions, Escala went from trading at $1.47 per share on January 23, 2003, the day that Escala and Afinsa entered into the merger agreement, to a $32-per-share company with a purported market cap of $898 million in the span of a few years.

3.     Because of these transactions, Afinsa was able to obtain a constant supply
of stamps that it needed for two reasons: (1) to replace forgeries that Manning
discovered in Afinsa's vault and (2) to feed the growing demand for stamp portfolios that
it offered to investors in what the criminal authorities in Spain have called a giant
pyramid scheme. The fraudulent related-party transactions ceased after May 2006, when
Spanish authorities raided Afinsa's offices and charged Afinsa and certain individuals
with engaging in a massive unlawful pyramid scheme.

4.     By engaging in such conduct, and committing the acts described in this
Complaint, defendant Escala directly and indirectly engaged in and, unless restrained and
enjoined by the Court, will continue to engage in, transactions, acts, practices and courses
of business that violate Sections 10(b), 13(a), 13(b)(2)(A) and (B) of the Securities
Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and
(B)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-13, [17 C.F.R. §§ 240.10b-5,
240.12b-20, 13a-1 and 13a-13], defendants Manning and Crawford directly and indirectly
engaged in and, unless restrained and enjoined by the Court, will continue to engage in,
transactions, acts, practices and courses of business that violate Sections 10(b) and
13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act
Rules 10b-5, 13b2-1, 13b2-2, and 13a-14, [17 C.F.R. §§ 240.10b-5, 240.13b2-1,
240.13b2-2 and 240.13a-14] aiding and abetting Escala's violations of Sections 13(a),
and 13(b)(2)(A) and (B) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1,
and 13a-13. Unless enjoined by order of this Court, defendants are likely to commit future
violations, and the SEC seeks a judgment permanently enjoining each defendant from
future violations. From defendants Manning and Crawford, the SEC also seeks

3

disgorgement of ill-gotten gains and prejudgment interest, an award of civil penalties

pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], and an officer and

director bar pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to Section 21(d),

21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(u)(e) and 78aa].  The

defendants, directly or indirectly, used the means or instrumentalities of interstate

commerce or the mails, or the facilities of a national securities exchange, in connection

with the transactions, acts, practices, and courses of business described herein.

6.     Venue is proper in this District pursuant to Securities Exchange Act

Section 27 [15 U.S.C. § 78aa], because certain of the transactions, acts, practices and

courses of business occurred with the Southern District of New York.  From 2005 to

2007, defendant Escala was headquartered in New York City.  As Escala officers,

Manning and Crawford conducted business in and from Manhattan from time to time.

Escala board meetings were held in Manhattan.

## DEFENDANTS

7.     **Escala Group, Inc.**, which was known as Greg Manning Auctions, Inc.

(GMAI) until September 28, 2005, is a Delaware corporation established in 1981 and

currently headquartered in Bethel, Connecticut.  Escala is a global network of companies

in the collectibles market (stamps, coins, arms and armour) with operations in North

America, Europe, and Asia as well as on the Internet.  Escala's common stock is

registered with the Commission pursuant to Section 12(g) of the Exchange Act  [15

U.S.C. §78*l*(g)].  Its common stock was previously registered pursuant to Section 12(b)

of the Exchange Act [15 U.S.C. §78*l*(g)] and was listed on the NASDAQ National

Market until February 7, 2007, when it was delisted and deregistered for failing to file its

SEC Form 10-K Annual Report for the fiscal year ended June 30, 2006 and its SEC Form

10-Q Quarterly Report for the quarter ended September 30, 2006. It is now traded over-

the-counter and quoted on the Pink Sheets. Escala's fiscal year runs from July 1 to June

30.

       8.    **Gregory Manning**, 62, is the founder of Escala. As of October 17, 2005,

he owned 7.7 percent of the common stock of the company. Manning was Chairman of

the Board of the company from its inception in 1981 through December 2002, and served

as the company's CEO from December 1992 to September 28, 2005. He was the

company's President from 1981 until August 12, 1993, and again from March 8, 1995 to

September 27, 2005. On September 28, 2005, Manning was appointed as President,

North American and Asian Philatelic Auction Division and also served as the First Vice

Chairman of the Board. On December 15, 2006, Manning resigned and automatically

became a consultant to Escala pursuant to his employment contract. On April 24, 2007,

the company terminated Manning's consulting agreement for cause.

       9.    **Larry Lee Crawford**, 60, is a licensed CPA in North Carolina, New

Jersey, and Pennsylvania. He was Escala's CFO and Executive Vice President from

April 2001 until May 2006. Crawford was one of three members of Escala's disclosure

committee, which was responsible for disclosure issues involved in Escala's filings with

the Commission. From 1996 to 2001, Crawford was CFO of a privately held company.

From 1970 to 1975, Crawford served as a senior accountant at one of the "big four"

accounting firms where, among other things, he worked as an auditor of publicly traded

companies. Crawford has a Bachelor's Degree and a Masters of Business Administration.

**RELATED ENTITIES**

10.     **Afinsa Bienes Tangibles, S.A. ("Afinsa")**,was a private company organized under the laws of Spain. Its principal place of business was in Madrid, Spain. Afinsa was engaged in commercial and trading activities involving tangible investment products throughout Europe. Afinsa's primary business was a stamp investment program. According to a September 27, 2005 article in the *Financial Times*, Afinsa sold €1.2 billion worth of stamps under its investment programs to 143,000 investors. From 1996-2001, the company's revenues grew at a compounded annual rate of 18.3 percent, reaching €180 million in 2001 (as of January 1, 2001 €180 million equaled approximately $169.5 million). Further, its total assets grew at a compounded annual growth rate of 36.1 percent since 1997, reaching €160.8 million in 2001 (as of January 1, 2001 €160.8 million equaled approximately $151.5 million). In May 2006, Afinsa owned approximately 70 percent of Escala's outstanding common stock. That month, the operations of Afinsa ceased when Spanish authorities raided its business operations as part of a criminal investigation. Afinsa is now operated under the control of trustees appointed by a Spanish court.

11.     **Central de Compras Coleccionables, S.L. ("CdC") (f/k/a/ GMAI-Auctentia Central de Compras)** ,was an Afinsa subsidiary headquartered in Spain that held stamp and art inventory. On September 8, 2003, CdC became a subsidiary of Escala, and Escala and CdC became the exclusive suppliers of collectibles for Afinsa on

6

a worldwide basis, selling directly to Afinsa as well as buying goods and procuring requested material for sale to Afinsa.

12. **Barrett & Worthen, Inc.**, ("Barrett & Worthen") is a small privately held publishing company located in Bedford, New Hampshire owned by Arlene Dunn Driscoll, a close family friend of Manning. In 1983, Barrett & Worthen purchased all rights to the Brookman Catalogue from Manning. Barrett & Worthen has published the Brookman Catalogue since then, including a series of Brookman Catalogues for Afinsa. On June 16, 2003, Afinsa entered into a confidential agreement with Barrett & Worthen, where, in exchange for the payment of $650,000, payable at $65,000 per year for ten years, Barrett & Worthen gave Afinsa "full and final editorial review and control" of the Brookman Catalogue, including "final review of all pricing." This agreement contained a confidentiality clause providing for non-disclosure of its contents.

13. **The Brookman Catalogue ("Brookman")**, is a stamp catalogue published by Barrett & Worthen. The catalogue and publishing rights were sold to different owners over the years and were sold to Manning in 1973. In 1983, Manning sold the Brookman Catalogue to Arlene Dunn Driscoll, owner of Barrett& Worthen.

## FACTS

### A.    **Afinsa's Stamp Investment Programs**

14. Afinsa sold investment contracts based on portfolios of stamps to thousands of individual investors in Europe. Afinsa offered a guaranteed, fixed rate of return equal to or greater than 7 percent per year for the stamp investments, promising investors that it would either find a buyer for the stamps at the original purchase price, or buy the stamps back itself at the end of the contract term. Alternatively, investors could

7

choose to invest the returns in more stamps.  Because the investment was supposedly

based upon the pristine condition of the stamps, Afinsa offered investors the option to

hold the stamps in its custody in a cost-free vault on its premises.

15.     The prices investors paid for these stamp portfolios were based on values

published in stamp catalogues.  The sale price to the investors always equaled the

catalogue prices, but Afinsa purchased the stamps at a fraction of the catalogue prices,

sometimes as low as 8 percent of the catalogue values.  When Afinsa repurchased the

stamps from the investors, the guaranteed price was equal to the catalogue price paid by

the investor plus the promised return or interest.  In order to sustain its business, Afinsa

had to sell stamps in increasingly larger quantities, because the catalogue values for

stamps tended not to increase annually in amounts sufficient to cover payments on

maturing contracts and other expenses.  The Spanish authorities have alleged that Afinsa

in fact sold interests in "batches of stamps which were completely overvalued, when not

actually forgeries" and that the promised return or interest that Afinsa paid its investors

came from the investments of new investors in a manner that the Spanish authorities have

alleged was a pyramid or ponzi scheme.

**B.     The Escala/Afinsa Business Combination Transaction**

16.     In April 2002, Manning initiated discussions with Afinsa of a possible

business combination of Escala and Afinsa.  An agreement was signed on January 23,

2003, consisting of three transactions, a Share Purchase Agreement, an Inventory

Purchase Agreement and a Subscription Agreement.  In the spring of 2003, before the

transaction had closed, Manning examined in Afinsa's vaults stamps used in Afinsa's

investment programs and discovered that stamps with an alleged estimated value of $200

to $300 million had been forged. In August 2003, after Afinsa confirmed Manning's

discovery, Afinsa terminated its previous supplier of stamps and entered into agreements

that made Escala its exclusive stamp supplier.

17.     On September 8, 2003, the Escala/Afinsa business combination

transaction closed. In exchange for, among other things, 13,000,000 shares of Escala

stock, Escala acquired Afinsa's subsidiary, CdC, and Escala and CdC became the

exclusive suppliers of collectibles for Afinsa. At the time of the merger, CdC held

approximately $11 million worth of stamp and art inventory. As a result of the

transaction, Afinsa became the beneficial owner of 72 percent of Escala's outstanding

stock.

18.     Despite having discovered stamps with an alleged estimated value of

$200 to $300 million to be forgeries in Afinsa's vault, Manning completed the

Escala/Afinsa business combination transaction without disclosing the existence of the

forgeries to others at Escala.

### C. The Afinsa Supply Agreement

19.     Escala was under tremendous pressure as the exclusive supplier of stamps

to Afinsa. Afinsa's stamp needs were enormous and critical to its continued operation.

Because it promised to buy back its stamp portfolios at 100 percent of the initial sale

price plus interest, Afinsa required increasing numbers of investors and, in turn,

increasing volumes of stamps to sell to them. For each subsequent year, Afinsa had to

increase the volume of stamps it sold in order to make new profits and to cover losses

incurred for repurchases and interest. In other words, more new sales each year meant more repurchases in future years which in turn required more new sales. Manning understood the tremendous pressure Afinsa was under to maintain its ponzi-like investment program.

### D.    The Brookman Agreement

20.    To ensure that it could keep increasing the catalogue value of the stamp portfolios that it marketed to investors, Afinsa wished to control a pre-existing, international stamp catalogue. In an internal Afinsa report, the company stated: "Steps are being taken to control an international catalogue or to create our own in order to be able to fix prices in accordance with our philosophy." In the words of a principal of Afinsa: "If we allow a third party to put out the prices, we are really in his hands, which cannot be admissible given the nature of our business."

21.    Afinsa's discussions about controlling its own catalogue were occurring in the early stages of the Escala/Afinsa business combination negotiations—and included Manning. Recognizing Afinsa's interest, Manning proposed that Afinsa consider entering into an arrangement with Barrett & Worthen, the current owner of the Brookman Catalogue – a stamp catalogue that Manning had owned before he sold it to a close family friend in 1983. Manning told Afinsa: "I believe that a deal could be set up with [the current owners] staying on to run the entire operation . . . . We would have complete editorial control over the prices in the catalogue, but we can still use the current editors for the bulk of the work."

22.     On behalf of Afinsa, Manning actively engaged in the negotiations with Barrett & Worthen focusing on editorial control of the Brookman Catalogue. On June 16, 2003, Afinsa and Barrett & Worthen signed an agreement (the "Brookman Agreement") that Afinsa would pay $650,000 in annual payments of $65,000 for ten years to Barrett & Worthen and would gain "full and final editorial review and control of the content and form of each edition of the Brookman Catalogue published during the term of [the] agreement," and that this "control and review shall include, but not be limited to, the final review of all pricing, the preparation and revision of all descriptions and the deletion and/or addition of material, in each case as [Afinsa], in its sole discretion, may determine . . . ." The Brookman Agreement provided for confidentiality and non-disclosure of its contents. Manning negotiated the Brookman agreement, and it was drafted in-house at Escala. Crawford learned of the agreement while it was being drafted in-house.

23.     Neither Manning nor Crawford told Escala's Audit Committee about the Brookman Agreement. Escala did not disclose the agreement publicly or mention it in any of its quarterly or annual reports that it filed with the SEC. To the contrary, Escala remained silent on the matter and Afinsa sought to portray the Brookman Catalogue as an independent entity. In October 2003, an Afinsa representative thanked Manning for negotiating the Brookman deal and reminded him that "our name must not appear" in any Brookman Catalogue.

24.     In fact, once the parties executed the Brookman Agreement, Barrett & Worthen became an affiliate and a related party of Escala's because both Escala and Barrett & Worthen and the Brookman Catalogue were then under common control of

11

Afinsa. (Escala was under Afinsa's control by virtue of Afinsa's majority share ownership, and Barrett & Worthen and the Brookman Catalogue were also under Afinsa's control by virtue of the Brookman Agreement.) Generally Accepted Accounting Principals ("GAAP") Statement of Financial Accounting Standards No. 57, Related Party Disclosures (FAS 57), defines control as the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an enterprise through ownership, by contract, or otherwise;" (Appendix B, definitions, at FAS 57-6).  FAS 57 then provides that:

> If the reporting enterprise and one or more other enterprises are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, the nature of the control relationship shall be disclosed even though there are no transactions between the enterprises.

¶ 4 at FAS 57-3.  FAS 57 further provides that:

> Financial statements shall include disclosures of material related party transactions .... The disclosures shall include: a. The nature of the relationship(s) involved; b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed ... and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; c. The dollar amounts of transactions for each of the periods ...; d. Amounts due from or to related parties . . . .

¶ 2 at FAS 57-2 and FAS 57-3.

25.     To comply with FAS 57, Escala was required to disclose the related-party status of Barrett & Worthen and the Brookman Catalogue.  Escala failed to disclose this material information with respect to the Brookman Agreement and also failed to disclose:

a. The nature of the relationship(s) involved; b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed ... and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; c. The dollar amounts of transactions for each of the periods ...; d. Amounts due from or to related parties....with respect to the Brookman Catalogue.  Instead, Manning and Crawford knowingly or recklessly failed to disclose the existence of the Brookman Agreement, and hence the existence of the related party to the Audit Committee, the auditors, and the public.[1]  By failing to disclose this information, Escala, Manning and Crawford knowingly or recklessly did not comply with the requirements of FAS 57 and thereby violated GAAP.  The failure to disclose the existence of the Brookman Agreement and that Barrett & Worthen was a Related Party was a material omission.

### E.    The United Nations Archive

26.     The United Nations philatelic archive ("UN Archive") consisted of artwork, imperforates, die proofs, and progressives pertaining to stamp issues and philatelic materials produced by the United Nations Postal Administration from 1951 to 2000, and presented an opportunity for Manning and Afinsa to use the Brookman Catalogue to implement their scheme.  A business acquaintance of Manning's purchased most of the UN Archive at a public auction on May 12, 2003 for $3.1 million.  A few weeks later, on June 1, 2003, Manning purchased the UN Archive from the acquaintance

---

[1] In July 2004, Escala's in-house counsel told Escala's Audit Committee about the existence of the Brookman Agreement.

for $4.8 million. On June 2, 2003, Manning sold most of the Archive that he had purchased to Afinsa for $6.4 million, payable in three equal installments.

27.     Manning coveted the Archive to sell to Afinsa. During the business combination negotiations, Manning told Afinsa about the May 12, 2003 public auction of what Manning described as "the entire philatelic archive of the United Nations." Manning emphasized: "Please note that this is all of the archive… we will be the only market maker in the world, as we will have the only supply" [emphasis in original]. Unbeknownst to Afinsa at the time it purchased the Archive from Manning, and contrary to Manning's assurances, Afinsa did not purchase the entire UN Archive collection from Manning. In fact, Manning held a portion back from Afinsa.

### 1.     The Impact of the UN Archive Transaction on Escala's Earnings

28.     In May 2003, Manning calculated and apportioned a part of the proceeds from the sale of the UN Archive to occur during Escala's and CdC's 2003 fourth quarter sales. On June 2, 2003, Escala issued an invoice to Afinsa for the sale of the UN Archive for a total of $6.4 million -- 8 percent of a Brookman Catalogue value of $80 million. The transaction was booked in Escala's 2003 fourth quarter.

### 2.     The Rapidly Rising Catalogue Values of the UN Archive

29.     Even before Escala purchased the UN Archive, Manning told Afinsa of his plans to list the UN Archive in the Brookman Catalogue at prices that were many times higher than the actual purchase prices. Once the UN Archive was obtained, Manning kept increasing the catalogue values. In a single day, the catalogue value changed more

14

than once with no indication of a cause or basis.   On June 2, 2003, Manning faxed an

Afinsa representative a letter saying that "[t]he total catalogue value may approach $150

Million or possibly more."  By June 4, Manning faxed the Afinsa representative another

letter stating that:  "The final catalogue inventory, I believe will be about $180 Million as

previously stated."

30.    Afinsa was appreciative of the rapidly rising UN catalogue values because

it had found more forged stamps in its vaults than Manning had previously detected.

Afinsa therefore urged Manning to "defend this valuation and, if possible, go for even

more."  By July 16, 2003 the total catalogue value of the UN Archive material delivered

to Afinsa exceeded $215 million.

### 3.    UN Archive Prices in the Brookman Catalogue

31.    The UN Archive was published in the Brookman Catalogue at values

established by Manning and edited by Afinsa.  Crawford knew that Manning established

the initial values of the archive.  The UN stamps were published in the Brookman

Catalogue to give them legitimacy, and because the Afinsa investment program would

only sell stamps that were listed in the major catalogues.  Therefore, with the purchase of

the UN Archive and the signing of the Brookman Agreement, Afinsa got what it most

wanted—the ability to secretly set the prices of stamps used in its investment program in

a philatelic-industry catalogue.

32.    The UN Archive Brookman Catalogue values established by Manning

formed the basis for future Escala UN stamp sales to Afinsa.  Escala sold UN

progressives and imperforate proofs to Afinsa at 15 percent percent of the UN Archive

catalogue values established in Brookman. Thus, Manning and Afinsa effectively set the price at which that additional UN material was sold by Escala to Afinsa. Afinsa determined the percentage that was used in pricing, and Manning with editorial input from Afinsa determined the actual catalogue values. The editors of Brookman had nothing to do with the prices of the UN material published in the catalogue. They obtained that information from Manning and Afinsa.

### F.     Escala's 2003 Annual Report

33.     On September 12, 2003, Escala filed its SEC Form 10-K Annual Report for the 2003 fiscal year with the SEC. The report included the revenues associated with the UN Archive transaction. The UN Archive sale netted Escala $1.6 million in its 2003 fourth quarter. The UN Archive accounted for approximately 6 percent, approximately 11 percent and approximately 53 percent of total company revenue, gross profit and pre-tax net income, respectively. The report did not mention the existence of the Brookman Agreement, Manning's role in negotiating it, or Escala's role in drafting it. The report also did not disclose Manning's role in setting the catalogue values for the UN Archive.

### G.     The "Carlos Deal"[2] – The First Attempt

34.     At the time of the Escala/Afinsa business transaction during which CdC became a subsidiary of Escala, Escala obtained a stamp inventory that was held at CdC.

---

[2] The parties to this transaction referred to it as the "Carlos Deal," named after Carlos de Figueiredo, a board member and administrator of Afinsa, whose father, Alberto de Figueiredo, was a founder and part owner (50 percent) of Afinsa. As of November 2005, Carlos de Figueiredo also held the position of Second Vice Chairman at Escala.

Escala represented in at least three public filings that it would not resell the CdC inventory back to Afinsa.

35.    In its SEC Form 14A Definitive Proxy Statement (filed with the SEC on August 13, 2003), its SEC Form 10-K Annual Report (filed with the SEC on September 12, 2003), and its SEC Form 424B3 Prospectus (filed with the SEC on November 3, 2003), Escala explained: "It is intended that CdC will use the inventory owned by it immediately following the consummation of the inventory purchase agreement to sell at various auctions run by other subsidiaries of [Escala]. Other than immaterial sales, such inventory will not be resold to [Afinsa] or its affiliates." These statements were materially false and misleading. Prior to making these statements and during the time period from August 13, 2003 to November 3, 2003, Manning was engaged in active discussions with Afinsa representatives to have Escala sell the inventory back to Afinsa.

36.    On June 6, 2003, prior to the filing of the SEC Form 14A Definitive Proxy Statement (filed with the SEC on August 13, 2003), Manning was conducting discussions of the sale back to Afinsa via e-mail with Emilio Ballester, Afinsa's Chief Accounting Officer. On September 11, 2003, one day prior to the filing of the SEC Form 10-K Annual Report (filed with the SEC on September 12, 2003), Manning was engaged in e-mail discussions with Esteban Perez of Afinsa setting forth the details of the transaction. That same day Perez scheduled a meeting between Afinsa, Manning and Crawford for September 23, 2003, in which an agenda item was the "Carlos Operation." In additional e-mails dated September 29, October 2, October 3, and October 6, 2003, Manning and/or Crawford were engaged in additional conversations with Afinsa personnel about this very transaction.

17

37.     Once the Escala/Afinsa business combination transaction was completed, Afinsa sought to carry out the planned inventory round-trip or Carlos Deal through a series of transactions. These transactions were planned for Escala's 2004 first quarter and second quarter which closed on September 30, 2003 and December 31, 2003, respectively. The Carlos Deal involved selling back to Afinsa certain pre-business combination inventory that CdC held. The Carlos Deal would have resulted in over $2 million in profit for fiscal year 2004. Manning anticipated the receipt of revenues from this sale by the end of the year.

38.     The parties did, in fact, consummate the transaction, however, some time between October 19 and 22, 2003, the managing partner of Escala's external auditing firm questioned Crawford and Manning about the legitimacy of the Carlos Deal transaction. At the time, Manning indicated that Escala needed the transaction for the quarter because it had given certain revenue guidance and the transaction would impact that guidance. After much discussion, the auditor convinced Manning to reverse the transaction.

**H.     The Carlos Deal – The Second Attempt**

39.     The auditing firm's intervention, however, did not prevent the scheme from moving forward—it only presented a delay. On November 11, 2003, Manning met with Afinsa in Spain. At the meeting Afinsa discussed a new Carlos II transaction that would provide revenues in the second quarter. Afinsa representatives and others in the meeting explained that the stamps must be sold to a third party, and that, Filasyl, a stamp company that served as a supplier to CdC, was open to taking part in the second Carlos

Operation for a commission. Thereafter, at a February 24, 2004 meeting of the
management committee of CdC, which Manning attended, a CdC official "announced
that a buyer had been found for a portion of the 'original' inventory purchased from
Afinsa and that this sale would probably happen in the first weeks of March."

40.     CdC entered into contracts with Filasyl, dated December 2003 and June
2004, which documented the sale of the CdC inventory to Filasyl for an aggregate
purchase price of $4.3 million. Within a short period of time, and prior to each "sale"
from CdC to Filasyl, Filasyl invoiced Afinsa for the amount of each sale, plus, a profit,
which Afinsa paid. In short, Escala circumvented its own internal controls and its
auditors and resold the CdC inventory to Afinsa at a profit by simply inserting a paid
middleman—contrary to its promise in its public filings. The CdC official that executed
the sales contract with Filasyl revealed that he discussed the structuring of the second
Carlos transaction with Manning.

41.     Escala booked the Carlos Deal/Filasyl round-trip transactions in the
second and fourth quarters of fiscal year 2004, recording revenue of $4.3 million and cost
of goods sold of $1.9 million, for a net of $2.4 million. In the second quarter, these
amounts constituted approximately 6 percent of total revenue, approximately 15 percent
of gross profit, and approximately 31 percent of pre-tax net income. In the fourth quarter,
these amounts constituted approximately 2 percent of total revenue, approximately 1
percent of gross profit, and approximately 2 percent of pre-tax net income. For Escala's
fiscal year 2004 annual report, the Filasyl transactions constituted approximately 2
percent of revenue, approximately 4 percent of gross profit, and approximately 7 percent
of pre-tax net income.

I.      **Washington Collection**

42.     The Washington Collection was a collection of items purported to have belonged to George Washington that Escala had purchased in 1996 for $1.2 million. The collection was appraised in 1997 at $2 million. Escala could not sell the collection for many years. By June 2003, after holding the collection for seven years, Escala wrote down the value of the collection to $96,000 pursuant to Company policy because the collection had not been sold. Manning and Crawford knew that this collection had not been sold, and Escala board members had been questioning why it was still on the company's books.

43.     In October 2003, a few weeks after the close of its fiscal year 2004 first quarter, Escala re-characterized $500,000 of a reimbursement from Afinsa for business combination-related expenses as a first quarter sale of inventory in that amount. This transaction lacked economic substance and was not a bona fide sale. The transaction was recharacterized from its original purpose after the quarter ended. The purchase price greatly exceeded Escala's carrying cost for the inventory, and the inventory was not completely delivered.[3] The business combination related expenses remained unpaid.

---

[3] Staff Accounting Bulletin ("SAB") 101 *Revenue Recognition in Financial Statements* (issued in December 1999) generally requires, among other things, that product be delivered to a customer or a customer-specified site before revenue may be recognized. (In its 2004 annual report, Escala stated that it accounted for revenue recognition in accordance with SAB 101.) Since all or part of the collection was not shipped to Afinsa (or its agent), Escala did not fully meet the criteria to recognize revenue for the Washington Collection.

44.     On September 29, 2003, just prior to the end of Escala's 2004 first quarter, Escala issued an invoice to Afinsa for $631,525 for "extraordinary expenses" that had already been incurred on behalf of Afinsa for legal, accounting and due diligence services related to the business combination negotiations.  On October 3, 2003, Afinsa wired $631,525 to Escala to pay for the expenses.  On October 10, after receipt of these funds, Crawford told Escala's controller to book the $631,000 as "consignor payable."

45.     A few weeks after the quarter closed, Manning told Crawford that he had sold the Washington Collection to Afinsa for $500,000.  Instead of creating a new invoice for $500,000, on October 17, 2003, Manning instructed Crawford to use a portion of the "extraordinary expenses" previously received to book the sale.  In order to comply with Mannings instructions to book the sale, Crawford had to destroy a previously issued invoice and issue a new one.  Crawford told Escala's bookkeeper that the invoice for $631,525 "should be destroyed and replaced with 2 invoices.  That invoice was in error.  Use the original invoice number for an invoice for $500,000... . [T]ype on the invoice 'Invoice for all components of the Washington Collection'... date the [invoice] no later than September 30."  Crawford instructed the bookkeeper to "date this invoice no later than September 30."  Crawford continued: "Type the second invoice for $131,525 to Afinsa and put on it 'To bill you for shared costs of the Investor Relations expenses for the period October 1-October 31, 2003.  This includes shared expenses for the investment community function of October 24. 2005.'  You should date this invoice the same as the other one.  These bills are <u>not</u> to be sent to Afinsa; the bills have already been paid."

46.     On Monday, October 20, the bookkeeper responded that "[t]he computer already assigned an invoice # and it cannot be used again ... the Auditors already have all

copies of billings to Afinsa as of last Thursday for the quarter …. What do you want me to do?" To which Crawford responded that same day: "I would like you to do exactly what I asked you to do except make two new invoice numbers." New invoices were created and backdated to September 30, 2003. Escala's re-characterization of the sale of the Washington Collection violated the provisions of GAAP.

47.    When the Washington Collection was delivered to Afinsa's agent in the United States, not all of the items were delivered. Manning had instructed Escala's warehouse manager not to deliver a chair that was a part of the collection. In addition, on separate occasions, Manning and Crawford instructed the warehouse manager to hide the chair from Escala's outside auditors because they did not want the auditors to know that the chair was on Escala's premises.

48.    Escala's SEC Form 10-Q Quarterly Report for the first quarter of fiscal year 2004 (filed with the SEC on November 13, 2003) included revenues from the purported sale of the Washington Collection that contributed $500,000 to first quarter revenue and $400,000 to pre-tax net income. In the first quarter, this revenue constituted approximately 1.4 percent of revenue, approximately 5.4 percent of gross profit, and approximately 14 percent of pre-tax net income.

**J.    UN Archive Auction**

49.    In November 2003, Manning held an auction of some additional materials from the UN Archive that Escala had set aside and not sent to Afinsa. The auction netted $1.25 million to Escala.

50.     Unbeknownst to Afinsa, Manning placed bids on Afinsa's behalf at this auction, purchasing for Afinsa more than $550,000 of Archive material. All lots at the auction were sold at or above the start bids that Escala set. Crawford knew that Manning placed bids on Afinsa's behalf at the auction.

51.     When Afinsa received the material from the UN Archive Auction, it expressed surprise, telling CdC that it thought it had already purchased the entire UN Archive. A CdC official passed this concern on to Manning. In response, and in a memorandum copied to Crawford, Manning pointed out the benefits of the auction to Escala's financial performance: "The profit from this sale was significant in [Escala's] fourth quarter of Fiscal 2003. The profit on the U.N. auction positively impacted [Escala's] second quarter of Fiscal 2004. I thought that Afinsa realized that [Escala] had retained specialized and unique U.N. material for auction."

52.     Escala's SEC Form 10-Q Quarterly Report for the second fiscal 2004 quarterly report (filed on February 5, 2004) included revenues from the UN Archive Auction of $1.25 million and cost of goods sold of $400,000, netting $850,000. The UN Archive Auction constituted approximately 2 percent of total revenue, approximately 6 percent of gross profit, and approximately 13 percent of pre-tax net income.

### K.     American Banknote Specimens

53.     As early as July 16, 2003, and prior to the close of the Escala/Afinsa business combination transaction, Manning proposed that Escala purchase and supply to Afinsa American Banknote Corporation ("ABN") specimens. The specimens consisted of Latin American revenue and specimen postage stamps. Manning also proposed "a

'special' American Banknote catalogue with the Brookman editors, who only await our instructions to produce the catalogue."

54.     The ABN specimens Manning proposed purchasing came from big bulk lots that were unloaded following a Christie's Auction House auction in the early 1990s where they failed to sell.  Two brothers bought these lots for between $420,000 and $450,000 after the Christie's auctioneers offered the unsold lots at prices below opening bids.  The two brothers, Arthur and Jeff Morowitz, put together a price list and attempted to market the ABN specimens to investors, but met with little success.  In 2003 or early 2004, one brother turned over his part of the ABN material to Escala, so that Manning could review it as part of the negotiations leading to Escala's purchase of the specimens, and in so doing commented that he had tried selling it without success.

55.     On March 4, 2004, Escala purchased one brother's share of the ABN material for $400,000.  At Manning's direction, Escala then purchased the other brother's portion of the ABN material for approximately $100,000.  Also at Manning's direction, Escala obtained another 15 – 20 cartons of ABN material from a stamp dealer in Canada for between $300,000 and $350,000.  The Canadian dealer had also purchased his portion of the ABN bulk lots at the Christie's auction in 1990 and according to Escala's Chief Operating Officer "still had a big pile left [after] all those years later, big pile."  All told, Escala paid about $850,000 for its inventory of ABN material.

### 1.     The Rapidly Rising Catalogue Values of the ABN Specimens

56.     Manning determined the values for the ABN specimens which were to appear in a proposed future edition of the Brookman catalogue that ultimately was never

published. Escala prepared spreadsheets containing these values. In the months before Escala's first shipment of ABN Specimens to Afinsa in February 2004, Manning had estimated supplying approximately €60 million (as of February 1, 2004 €60 million equaled approximately $74.8 million) catalogue value but had told Afinsa that a Brookman Catalogue draft could be finished in January with a catalogue value of approximately €30 to 40 million (as of February 1, 2004 €30 to 40 million equaled approximately $37.4 to $49.8 million). Manning also told Afinsa that "[t]he new [Brookman] catalogue will absolutely follow our suggestions about prices." As with the UN Archive, the catalogue values continued to rise.

57.     With respect to Escala's first sale of ABN specimens to Afinsa, Manning used a catalogue that the two brothers had prepared as a starting point for setting the catalogue values. But Manning dramatically increased the prices of each item. Thus an item listed in the Morowitz catalogue for $6 was listed in Escala's spreadsheet for €130 (as of February 1, 2004 €130 equaled approximately $162).

58.     In December 2004, after selling Afinsa ABN specimens worth a purported $266 million in catalogue value, Manning responded to an Audit Committee request and calculated the total catalogue value of ABN specimens that Escala had remaining in inventory. The amount was a staggering $512,348,355. All told, the total alleged catalogue value set by Manning for the ABN specimens held by Escala, and purchased for approximately $850,000, approached $778 million.

### 2.    Impact of the ABN Specimens on Escala's Earnings

59.    Pursuant to its agreement to provide ABN Specimen stamps to Afinsa, on February 17, 2004, Escala invoiced Afinsa $6,230,707 for its first shipment of ABN Specimen stamps.   The sale price was 12.5 percent of a catalogue value of $45,313,539 that Manning had set.  Between February 17, 2004 and December 12, 2005, Escala issued thirteen more invoices to Afinsa for ABN Specimen material.  The sales netted Escala approximately $57 million in revenues.  The purchase prices were calculated as a percentage of catalogue values totaling approximately $366 million.  Over time, the percentage of catalogue value that Afinsa was charged for these sales increased from 12.5 percent to 15 percent; at the same time Manning continually increased the catalogue values for the materials.

60.    The sales of ABN Specimens allowed Escala to meet periodic earnings forecasts.  Towards the last month of each quarter, Manning directed Escala's stamp expert to put together $10-$15 million worth of ABN specimens each quarter without regard to the type of stamp.  These ABN sales allowed Escala to meet its forecast for that year.  For its 2004 fiscal year, Escala exceeded the high end of its revenue forecast range by approximately $2 million based on ABN Specimen sales to Afinsa of $17,732,032. Without those ABN sales, Escala would have missed the low end of its revenue forecast range by approximately $10 million.  Likewise, revenues from ABN sales allowed Escala to meet its revenue forecast for its fiscal year 2005 first quarter.

61.    For fiscal year 2004, the ABN collection was 8 percent, 28 percent and 53 percent of Escala's total company revenue, gross profit and pre-tax net income,

26

respectively.  In fiscal year 2005, the ABN collection was approximately 14 percent, 35

percent and 58 percent of Escala's total company revenue, gross profit and pre-tax net

income, respectively.   For the first six months of fiscal year 2006, the ABN collection

was approximately 3 percent, 7 percent and 12 percent of Escala's total company

revenue, gross profit and pre-tax net income, respectively.

### L.      UN Imperforates & Progressive Proofs

62.      Escala subsequently sold Afinsa additional UN material similar to that

from the UN Archives.  These were "imperforates and progressive proofs"—stamps in

the process of production or design but not entered into circulation.  In April 2004, Escala

obtained this material for $2.8 million, a price negotiated by Manning.  Between

December 2004 and July 2005, Escala booked revenues of approximately $11.8 million

on sales of this same material to Afinsa.  Escala's sale prices to Afinsa were calculated as

15 percent of a total catalogue value of approximately $70 million for the imperforates

and progressive proofs.  Manning derived the catalogue value for these sales from the UN

catalogue values that he and Afinsa set in the Brookman Catalogue.

63.      For fiscal 2005, the UN imperforates and progressive proofs to Afinsa

accounted for approximately 4 percent, 11 percent and 19 percent of Escala's total

company revenue, gross profit and pre-tax net income, respectively.  The transactions

were booked in the second and third quarters of FY 2005.  For Escala's 2005 third

quarter, these sales constituted 74 percent of Escala's total pre-tax net income.

**M.      In-House Counsel Informs the Audit Committee of the Existence of the Brookman Agreement**

64.      In July 2004, Escala's in-house counsel told Escala's Audit Committee about the existence of the Brookman Agreement.   Prior to this time, neither Manning nor Crawford had told the Audit Committee about the Brookman Agreement.  On July 15, 2004, the Audit Committee met to discuss the agreement.  This was the first time Escala's Audit Committee and Escala's auditor learned that the agreement existed.

65.      Significantly, neither the Audit Committee nor the auditors knew at this time that Manning set the catalogue values.  To the contrary, Manning had represented to the auditors that he was not involved in setting catalogue prices.  Others understood that he gave some direction on the value of stamps, or that from time to time he was consulted on specific stamps, but not that he was setting the catalogue values for the entire collection.

66.      Concerned that the Brookman Catalogue was not independent and about the values in the catalogue for the collections sold to Afinsa, the Audit Committee required Manning to obtain appraisals of the pricing in the Brookman Catalogue and any other catalogues that were not independent of Escala.  The Audit Committee also decided to update the Management's Discussion and Analysis (MD&A) section of its quarterly reports to state that the prices for the materials it sold to its parent Afinsa were generally determined with reference to the prices in catalogues used throughout the industry and that in certain cases the company obtained independent appraisals of catalogue prices. Notably, when aware of the Brookman Agreement, neither Escala, Manning or Crawford disclosed this information.

N.    **Escala's Fiscal 2005 Quarterly and Annual Reports**

67.    Escala filed SEC Form 10-Q Quarterly Reports on November 8, 2004,

February 9, 2005, and May 13, 2005, and an SEC Form 10-K Annual Report on

September 16, 2005 with the SEC. These reports included revenues from the ABN

Specimen sales and the UN imperforate sales as described above. Escala's updated

MD&A disclosure, contained in its quarterly reports, first appeared in the quarterly report

for the fiscal 2005 second quarter. The revised MD&A discussion read as follows:

> Sales of philatelic material to Afinsa under the contracts are made via the
> fulfillment of purchase orders from Afinsa. The Company generally
> purchases, inspects, and processes the philatelic materials in a format
> specified by Afinsa. Currently, the prices for material sold by the Company
> to Afinsa under the contracts are based on Afinsa's "bid" prices, which are
> generally determined with reference to prices for such material contained in
> catalogues that are used throughout the industry. In certain cases the
> Company obtains independent appraisals of such catalogue prices. Although
> the actual percentage of catalogue value varies based on the type of material
> involved and related supply and demand factors, the Company believes that
> in any given case, the percentage is substantially equivalent to what would
> be charged by a clearly independent party.

68.    This MD&A discussion was false and materially misleading. The

Brookman Catalogue was not independent and the prices in that catalogue were

manipulated by Escala's management, i.e., Manning. There was no published catalogue

used throughout the industry for the ABN specimens. Instead of Afinsa proposing "bid"

prices, Manning typically set the catalogue prices that Afinsa paid a percentage of. In

addition, Manning undermined the appraisal process causing them not to be independent.

69.    Manning and Crawford knew that this MD&A discussion was false and

materially misleading, but they approved this language anyway, and they signed quarterly

reports that contained this language.

70.     The MD&A disclosure falsely indicated that the prices Escala charged Afinsa were equivalent to those charged in arms-length transactions because the disclosure stated that those prices were determined with reference to industry catalogues and/or appraisals.  Moreover, Afinsa's control over the Brookman Catalogue should have been disclosed because that control relationship materially affected Escala's operating results as it allowed Manning to set prices that would allow Escala to meet its forecasts. Finally, under FAS 57, Escala should have disclosed the revenues that it received by virtue of the catalogue prices in the Brookman Catalogue.

### O.     Manning Undermined the Appraisal Process

71.     The appraisal process was undermined from the outset in two ways.  The appraisers did not know that Manning had placed bids for Afinsa at the UN Archive Auction.  Instead, Manning referred them to the prices obtained for UN material at that auction as a possible benchmark.  In addition, the appraisers did not know that Afinsa controlled the Brookman Catalogue and that Manning set the Brookman Catalogue prices.

72.     While the auditors did not know these two important facts, both Manning and Crawford did know them.  As a result, Manning and Crawford cannot rely on the opinions that the appraisers provided to justify the catalogue prices.

### 1.     The August 2004 Appraisals

73.     In August 2004, Manning obtained letters from three appraisers.  Each wrote that he had reviewed the Brookman Catalogue pricing for the UN Archives -- two wrote that they had also reviewed the American Banknote specimens -- and concluded

that the pricing was fair or reasonable. As for the pricing of the UN Archives, each based his assessment on, among other things, the realization from Manning's auction of a portion of the UN Archive material. None of the appraisers looked at any of the Archive or specimen material. Instead, they reviewed price lists provided by Manning or specific pages from the catalogue, and relied on Manning's representations concerning the condition of the materials. Because they did not examine any of the material, all of the appraisers considered their letters to be "opinions" and not the more rigorous appraisals. In fact, Manning specifically asked two of the appraisers for an "opinion" and not an appraisal.

74.     One of the appraisers did not even draft the letter that he signed. Instead, Manning furnished the letter, which the appraiser signed and handed back to Manning. Finally, none of the appraisers were paid for their opinion letters, either because they spent just a few hours working on the project and did not deem it necessary to charge for it, or because they considered it a favor to a friend.

### 2.     The March 2005 Appraisals

75.     In March 2005, Manning obtained letters signed by two appraisers. One letter stated that the appraiser had performed "a complete review of the catalogue listings contained in the new Brookman Catalogue of specimen stamps" and that he agreed "with the pricing policy set forth in the specimen stamp catalogue." The appraiser also stated that he had reviewed the UN Archives and that the prices in the Brookman 2004 listings were similar to the prices realized at Manning's auction of the UN Archives, and that in his opinion, "the editors of Brookman ha[d] correctly evaluated the United Nations

archive in their pricing." The other appraiser's letter stated that he had reviewed the catalogue pricing for the American Banknote specimens "that the Brookman Company is producing" and that "he had found the catalogue values to be reasonable." As for the pricing of the UN Archive, the letter stated that Manning's auction of the UN Archive material "validated" the Brookman Catalogue UN Archive pricing.

76.     Neither appraiser authored the letters. Both traveled to New York and spent one day in Manning's offices. One appraiser later typed up Manning's handwritten notes, signed the typewritten letter, and returned it to Manning. According to the other appraiser, the entire substance of the letter that he signed was written by Manning. In addition, neither could verify the accuracy of certain statements in their letters.

### P.     Escala's Fiscal 2006 Quarterly Reports

77.     Escala filed three SEC Form 10-Q Quarterly Reports in fiscal year 2006 on November 8, 2005, February 9, and May 10, 2006 with the SEC. These quarterly reports included revenues from the ABN Specimen sales. The first two of these quarterly reports included the same materially false and misleading MD&A disclosure discussed above. Escala has not filed a periodic report with the Commission since its March 31, 2006 SEC Form 10-Q.

### Q.     The Audit Committee Discovers that Manning Set the Prices in the Brookman Catalogue

78.     Sometime after May 2006, as a result of an internal investigation, the Audit Committee first learned that Manning had set the prices in the Brookman Catalogue. Manning, himself, did not admit to setting the prices until November 30,

2006, when he wrote a memorandum to Escala's board of directors, in-house counsel, and outside auditor in which he stated "I established the Brookman Catalogue prices for the U.N. Archives and the proposed Brookman ABN catalogue prices."

### R.    Escala Meets Earnings Forecasts

79.    Between September 2003 and September 2004, Escala provided guidance on its quarterly and annual net income and revenue expectations. Escala also issued a series of successive forecasts for its 2004 fiscal year-end results. Escala met all of its net income forecasts, and met all but two of its revenue forecasts. During this time period, Escala met five of its net income forecasts due to income derived from the Archive or Washington Collection transactions with Afinsa. For example, Escala estimated net income of between $4.8 and $5.2 million for its 2004 third quarter. Archive sales to Afinsa brought in $5.8 million in pre-tax profits to that quarter. Escala's share price increased 18 percent on the news that it exceeded its forecast that quarter. Likewise, Escala met two of its revenue forecasts due to revenue derived from the Archive or Washington Collection transactions with Afinsa. For fiscal year 2004, Escala made five successive revenue forecasts, increasing the forecast over time from $135 million to a range between $205 and $210 million. Escala's actual revenue that year was $212,890,000; its Archive and Washington Collection transactions with Afinsa contributed over $18 million of that amount. Escala's share price increased 5.3 percent after it met that forecast.

**S.      Manning's and Crawford's Ill-Gotten Gains**

80.      From 2003 through 2005, Manning and Crawford earned performance-based bonuses and stock options.  To the extent that each received compensation that derived from Escala's meeting forecasts or from increases in Escala's share price due to its financial performance at times that each knew of the false and misleading disclosures and other misconduct described in this Complaint, this compensation constitutes unjust enrichment.

**T.      Manning's and Crawford's Scienter**

81.      Manning signed, as CEO, six successive SEC Form 10-Q Quarterly Reports (filed with the SEC on:  November 13, 2003, February 5, 2004, May 6, 2004, November 8, 2004, February 9, 2005 and May 13, 2005), and three successive SEC Form 10-K Annual Reports (filed with the SEC on:  September 12, 2003, September 9, 2004 and September 13, 2005 as amended September 16, 2005) which failed to disclose the Brookman Agreement and two SEC Form 10-Q Quarterly Reports (filed with the SEC on:  February 9, 2005 and May 13, 2005) that contained the false and misleading disclosures about how Escala priced the archive collections that it sold to Afinsa.  At the time, Manning knew that the failure to disclose the existence of the Brookman Agreement was material because, among other things, the related party status of Afinsa was disclosed and the Audit Committee discussed and questioned the independence of Brookman several times.  In addition, at the time Manning knew the disclosures regarding the pricing of the archive collection were false because he set the prices in the Brookman Catalogue and he subverted the appraisal process in order to provide opinions that would support the catalogue prices he selected.

82.     Manning also intentionally or recklessly: manipulated values for the material he sold Afinsa in the UN Archive, UN imperforates, and ABN specimen transactions; sold back to Afinsa in a round-trip transaction its pre-business combination inventory held at CdC in direct contravention of Escala's promise not to do so; falsely reported a payment of business combination-related expenses as the "sale" of the Washington Collection; secretly placed bids for Afinsa at the UN Archive auction; and provided the Audit Committee with opinions that he wrote, edited, or otherwise improperly influenced instead of independent appraisals. These transactions had a material impact on Escala's financial statements.

83.     As CFO, Crawford signed eight successive SEC Form 10-Q Quarterly Reports (filed with the SEC on: November 13, 2003, February 5, 2004, May 6, 2004, November 8, 2004, February 9, 2005, May 13, 2005, November 8, 2005 and February 9, 2006), and two successive SEC Form 10-K Annual Reports (filed with the SEC on: September 9, 2004 and September 13, 2005 as amended September 16, 2005) which failed to disclose the Brookman Agreement and four SEC Form 10-Q Quarterly Reports (filed with the SEC on: February 9, 2005, May 13, 2005, November 8, 2005 and February 9, 2006) that contained the false and misleading disclosures about how Escala priced the archive collections that it sold to Afinsa. Crawford, a CPA, knew the requirements of FAS 57 and that the failure to disclose the existence of the Brookman Agreement was material because, among other things, the related party status of Afinsa was disclosed and the Audit Committee discussed and questioned the independence of Brookman several times. In addition, he knowingly or recklessly read and approved the misleading MD&A disclosures in each of Escala's four quarterly reports from October

35

2004 through December 2005 concerning how Escala priced the materials it sold to Afinsa. Crawford was one of the three members of Escala's disclosure committee, which was responsible for disclosure issues involved in Escala's filings. In particular, Crawford knew that Manning set the Brookman Catalogue prices, and that the Audit Committee did not know this important fact. Crawford also knew that the appraisers did not know about the existence of the Brookman Agreement and that Manning set the catalogue's prices as well as some of the bid prices at the UN Auction. Crawford knowingly or recklessly violated the antifraud provisions of the Exchange Act by booking the purported sale of the Washington Collection. As described above, this transaction was material.

84.    Escala's scienter is established by the scienter of its then-CEO (Manning) and it's then-CFO (Crawford) as described above.

## FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

85.    Paragraphs 1 through 84 are realleged and incorporated by reference.

86.    Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] prohibit a person, in connection with the purchase or sale of a security, from: employing any device, scheme or artifice to defraud; making any untrue statement of a material fact or omitting to state a material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading; and engaging in any act, practice or course of business which operates or would operate as a fraud or deceit on any person.

87.     By reason of the foregoing, Escala, Manning, and Crawford each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 13a-1, and 13a-13] and Aiding and Abetting those violations

88.     Paragraphs 1 through 87 are realleged and incorporated by reference.

89.     Escala filed with the SEC the annual reports on Form 10-K and quarterly reports on Form 10-Q described herein that contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements made not misleading, concerning, among other things, Escala's gross profits, revenues, and/or net income. Manning and Crawford caused those untrue statements and knew that they were included in the annual and quarterly reports.

90.     By reason of the foregoing, Escala violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R §§ 240.12b-20, 240.13a-1, and 240.13a-13].

91.     By reason of the foregoing, Manning and Crawford aided and abetted Escala's violations of Exchange Act Sections 13(a) and Rules 12b-20, 13a-1, 13a-13.

## THIRD CLAIM

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]

92.     Paragraphs 1 through 91 are realleged and incorporated by reference.

93.     Exchange Act Section 13(b)(5) provides that no person shall knowingly falsify any book, record, or account required under Section 13(b)(2) or circumvent internal controls.

94.     Manning and Crawford each violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)], when each failed to identify the related-party nature of the Brookman Agreement. Manning directed Crawford to book, and Crawford did book $500,000 of a reimbursement from Afinsa for business combination-related expenses as the sale of the Washington Collection. Manning approved the Filasyl transactions as sales to a third party when he knew or was reckless in not knowing that the transactions were, in substance, round-trip transactions.

95.     By reason of the foregoing, Manning and Crawford each violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)].

### FOURTH CLAIM

#### Violations of Section 13(b)(2)(A) and (B)
#### of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)&(B)]

96.     Paragraphs 1 through 95 are realleged and incorporated by reference.

97.     Escala violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by maintaining false and misleading books and records that, among other things, mischaracterized the economic substance of the purported sale of the Washington Collection and the Filasyl transactions, and failed to identify the related-party nature of Barrett & Worthen.

98.     Escala violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurances that its transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

99.     By reason of the foregoing, Manning and Crawford aided and abetted Escala's violations of Section 13(b)(2)(A) and (B).

### FIFTH CLAIM

#### Violations of Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

100.     Paragraphs 1 through 99 are realleged and incorporated by reference.

101.     Rule 13b2-1 of the Exchange Act makes it unlawful for any person to falsify, or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A).

102.     Manning and Crawford, directly or indirectly, falsified or caused to be falsified, Escala's books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.   Each failed to identify the related-party nature of the Brookman Agreement.   Manning directed Crawford to book, and Crawford did book $500,000 of a reimbursement from Afinsa for business combination-related expenses as the sale of the Washington Collection.   Manning approved the Filasyl transactions as sales to a third party when he knew or was reckless in not knowing that the transactions were, in substance, round-trip transactions.

103.     By reason of the foregoing, Manning and Crawford each violated Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1].

### SIXTH CLAIM

#### Violations of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]

104.     Paragraphs 1 through 103 are realleged and incorporated by reference.

105.    Manning and Crawford, as officers and directors of Escala, directly or indirectly, made materially false or misleading statements, or omitted to state, or caused another person to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to Escala's accountants in connection with their audits of Escala's financial statements for fiscal years 2004, 2005, and 2006.  Manning and Crawford each instructed Escala's warehouse manager not to disclose to Escala's auditors that a portion of the Washington Collection remained in Escala's possession.

106.    By reason of the foregoing, Manning and Crawford each violated Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2].

### SEVENTH CLAIM

**Violation of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]**

107.    Paragraphs 1 through 106 are realleged and incorporated by reference.

108.    Manning and Crawford knowingly certified quarterly and annual reports that included revenues from these transactions, and failed to disclose material information concerning Escala's transactions with Afinsa, and made misleading statements about how Escala set its prices.  By reason of the foregoing, Manning and Crawford each violated Exchange Act Rule 13a-14 [17 C.F.R. §240.13a-14].

## PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that this Court enter a Final Judgment:

109.    Permanently enjoining Escala, Manning, and Crawford from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5];

110.    Permanently enjoining Escala from violating Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B),] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 13a-1, and 13a-13];

111.    Permanently enjoining Manning and Crawford from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(b)(5)] and Exchange Act Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 13b2-2];

112.    Permanently enjoining Manning and Crawford from aiding and abetting the violation of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B),] and Rules 12b-20, 13a-1, 13a-13 [17 C.F.R. §§ 240.12b-20, 13a-1, and 13a-13];

113.    Permanently enjoining Manning and Crawford from violating Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14];

114.    Ordering Crawford and Manning to pay disgorgement of any unjust enrichment from the conduct alleged herein;

115.    Ordering Crawford and Manning to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] in respect of their violations;

116.    Permanently and unconditionally barring Manning and Crawford from serving as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

117.    Granting such other relief as this Court may deem just and appropriate.

Dated: March 23 , 2009

Respectfully submitted,

Mark A. Adler (MA 8703)
Jane M.E. Peterson (Trial Attorney)
Cheryl J. Scarboro
C. Joshua Felker
Deborah A. Tarasevich
Devon A. Brown
Matthew Skidmore

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Mail Stop 4010
Washington, D.C. 20549-4010
Tele: (202) 551- 4468 [Peterson]
Fax:  (202) 772-9245  [Peterson]