UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SECURITIES AND EXCHANGE COMMISSION,     :
                         Plaintiff,     :
                                        :     09 Civ. 2646 (DLC)
              -v-                       :
                                        :     OPINION & ORDER
ESCALA GROUP, INC., GREGORY MANNING,    :
and LARRY LEE CRAWFORD, CPA,            :
                         Defendants.    :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:
Jane M.E. Peterson
Mark A. Adler
Cheryl J. Scarboro
C. Joshua Felker
Deborah A. Tarasevich
Devon A. Brown
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4010

For Defendant Gregory Manning:
Jeffrey C. Hoffman
William A. Rome
Lisa Rosenthal
Hoffman & Pollok LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016

For Defendant Larry Lee Crawford:
Nicholas M. De Feis
Craig Trainor
Philip C. Patterson
De Feis O'Connell & Rose, P.C.
500 Fifth Avenue, 26th Floor
New York, NY 10110

DENISE COTE, District Judge:

Plaintiff United States Securities and Exchange Commission ("SEC") has brought suit alleging that two individual defendants participated in a disclosure and accounting fraud scheme relating to transactions between Escala Group, Inc. ("Escala") and its parent company Afinsa Bienes Tangibles, S.A. ("Afinsa").[1] Escala and Afinsa are both in the collectibles market. Defendant Gregory Manning was Escala's chief executive officer and defendant Larry Lee Crawford was Escala's chief financial officer.

The complaint alleges that Manning and Crawford violated antifraud and reporting provisions of the federal securities laws by 1) failing to disclose the related party status of Barrett & Worthen, Inc. ("B & W"), which resulted in Afinsa's control of the Brookman Catalogue of stamp values, and by failing to disclose the revenues obtained by virtue of Afinsa and Manning's control of the catalogue; 2) falsely representing that several large stamp archives that Escala sold to Afinsa were sold at prices determined by reference to independent catalogues and appraisals when in fact Manning set the catalogue prices used and influenced the appraisals; and 3) falsely

---

[1] A consent judgment was entered against Escala on March 30, 2009.  Escala was known as Greg Manning Auctions, Inc. ("GMAI") until September 28, 2005.  This Opinion will refer to both Escala and GMAI collectively as "Escala."

reporting a payment for business combination-related expenses as a sale of certain antiques.[2]  The complaint seeks the following relief against Manning and Crawford: civil penalties, disgorgement of ill-gotten gains, an injunction permanently enjoining them from future violations of the federal securities laws, and an injunction barring them from serving as an officer or director of a public company.

On May 19, 2009, Manning moved to dismiss certain of the allegations and claims in the complaint, and on the same date Crawford moved to dismiss the complaint as against him.  Both motions were fully submitted on June 24, 2009.  For the following reasons, the motions are denied.

BACKGROUND

The following facts are taken from the complaint in this action, and are presumed to be true for the purposes of this motion.  Only the facts necessary to the resolution of this motion are set forth below.

Escala is a global network of companies in the collectibles market, which includes stamps, coins, arms, and armor.  Its common stock is registered with the SEC pursuant to Section

---

[2] The complaint also alleges that Manning violated the securities laws by selling back to Afinsa certain inventory acquired by Afinsa in contravention of Escala's public promise not to do so. As that transaction is not the subject of the instant motions, it will not be addressed in this Opinion.

12(g) of the Securities Exchange Act of 1934 ("Exchange Act"),
15 U.S.C. § 78l(g), and its common stock was previously
registered pursuant to Section 12(b).  Escala's fiscal year runs
from July 1 to June 30.  Manning founded Escala, and served
Escala in various capacities since its founding, including as
Chairman of the Board of Directors, CEO, and President.
Crawford is a licensed CPA who served as Escala's CFO and
Executive Vice President and was a member of Escala's disclosure
committee.

       As of May 2006, 70% of Escala's outstanding common stock
was owned by Afinsa, a private company organized under the laws
of Spain.  Escala and another Afinsa subsidiary were the
exclusive suppliers of stamps to Afinsa.  Afinsa's principal
business was a stamp investment program, in which it sold
investment contracts based on portfolios of stamps to investors
in Europe.  Afinsa offered investors a guaranteed fixed rate of
return for the stamp investments and promised investors that it
would find a buyer for the stamps at the original purchase price
or would buy the stamps back itself at the end of the contract
term; alternatively, the investors could invest their returns in
more stamps.

       The prices that Afinsa's investors paid for the stamp
portfolios were equal to the values for the stamps published in
stamp catalogues, but Afinsa purchased the stamps for a fraction

                                    4

of the catalogue values.  When Afinsa repurchased stamps from the investors, the price was the catalogue price plus the guaranteed rate of return.  Afinsa ceased operations in May 2006 when it was raided by Spanish authorities as part of a criminal investigation.  The authorities allege that Afinsa was selling investors interests in portfolios of stamps that were overvalued or forgeries, and that the promised rate of return was paid from the investments of new investors in a pyramid or ponzi scheme.

A.   The Escala/Afinsa Business Combination

In January 2003, after conversations initiated by Manning in April 2002, Escala and Afinsa signed a business combination arrangement.  In the spring of 2003, before this transaction had closed, Manning examined the stamps in Afinsa's vault that were used for Afinsa's investment program, and he discovered that stamps with an estimated value of $200 to $300 million were forgeries.  Afinsa confirmed this discovery in August 2003, and Escala entered into an agreement to become Afinsa's exclusive stamp supplier.

The business combination transaction closed in September 2003; Afinsa acquired shares of Escala's common stock such that it became the owner of 72% of Escala's outstanding stock, and Escala acquired Afinsa's other stamp supplier subsidiary. Manning completed this business combination with Afinsa without

5

disclosing the discovery of the forgeries to others at Escala.
Escala was under pressure as the exclusive supplier of stamps to
Afinsa, because the operation of Afinsa's investment program
required increasing numbers of investors, and therefore
increasing numbers of stamps to sell.

B.   The Brookman Agreement

     Afinsa also wanted to be able to increase the catalogue
prices of the stamps it was selling to investors, and therefore
sought control of an existing international stamp catalogue.
Discussions on this topic included Manning, and were occurring
during the early stages of the Escala/Afinsa business
combination negotiations.  Manning suggested to Afinsa that it
should enter into an arrangement with B & W, a company that
owned the stamp catalogue known as the Brookman Catalogue,
telling Afinsa: "I believe that a deal could be set up with [the
current owners] staying on to run the entire operation . . . .
We would have complete editorial control over the prices in the
catalogue, but we can still use the current editors for the bulk
of the work."[3]  Manning negotiated with B & W on behalf of Afinsa
to gain editorial control of the Brookman Catalogue.

---

[3] B & W is owned by a close family friend of Manning.  In 1983,
Manning sold the rights to the Brookman Catalogue (which he had
purchased in 1973) to B & W.

6

On June 16, 2003, Afinsa and B & W signed the Brookman Agreement, which gave Afinsa "full and final editorial review and control of the content and form of each edition of the Brookman Catalogue published during the term of [the] agreement," including "final review of all pricing, the preparation and revision of all descriptions and the deletion and/or addition of material."  The agreement was negotiated by Manning and drafted in-house at Escala.  Crawford learned of the agreement while it was being drafted at Escala.

The Brookman Agreement also provided for non-disclosure of its contents.  In October 2003, a representative of Afinsa thanked Manning for brokering the Brookman Agreement and reminded Manning that Afinsa's name "must not appear" in any Brookman Catalogue.

C.  <u>United Nations Archive</u>

The United Nations philatelic archive ("UN Archive") consisted of artwork, imperforates, die proofs, and progressives pertaining to stamp issues and philatelic materials produced by the United Nations Postal Administration from 1951 to 2000.  On May 12, 2003, a business acquaintance of Manning purchased most of the UN Archive at a public auction for $3.1 million.  On June 1, 2003, Manning purchased the UN Archive from the acquaintance for $4.8 million.

On June 2, 2003, Manning sold most of the UN Archive to Afinsa for $6.4 million, payable in three equal installments. Manning had told Afinsa about the public auction of the UN Archive that was to occur during the Escala/Afinsa business combination negotiations.  The June 2 transaction was booked in Escala's 2003 fourth quarter.  The $6.4 million price was 8% of the Brookman Catalogue value of $80 million for the material.

Even before Escala had acquired the UN Archive material, Manning informed Afinsa of his plan to list the UN Archive material in the Brookman Catalogue at prices that were many times higher than the actual purchase prices.  On June 2, 2003, the day of the sale of the UN Archive from Escala to Afinsa, Manning told Afinsa that the total catalogue value of the same may approach $150 million or more, and by June 4 he told Afinsa that the final catalogue value for the material would be about $180 million.  Afinsa urged Manning to "go for even more," and by July 16, 2003, the total catalogue value of the UN archive material was over $215 million.  Crawford knew that Manning set the initial values in the Brookman Catalogue for the UN Archive.

The values in the Brookman catalogue set by Manning also formed the basis for future Escala sales of UN stamp material to Afinsa.  Escala obtained the "imperforates and progressive proofs" in April 2004 for $2.8 million.  It then sold the material to Afinsa, booking revenue of approximately $11.8

million between December 2004 and July 2005.  The sale prices to
Afinsa were calculated as 15% of the $70 million catalogue value
for the imperforates and progressive proofs; the catalogue value
was derived by Manning from the UN catalogue values he and
Afinsa set in the Brookman Catalogue.  These transactions were
booked in the second and third quarters of Escala's 2005 fiscal
year.


D.  The Washington Collection

    In 1996, Escala purchased a collection of items for $1.2
million that was purported to have belonged to George
Washington.  In 1997, the collection was appraised at a value of
$2 million.  Escala could not sell the collection, however, and
in June 2003 it wrote down the value of the collection to
$96,000 pursuant to a company policy because the collection had
not been sold.  Both Manning and Crawford knew that the
collection had not been sold, and Escala board members were
asking why the collection was still on the company's books.

    In October 2003, Escala re-characterized $500,000 of a
reimbursement payment from Afinsa for business combination-
related expenses as a first quarter sale of inventory for
$500,000.  The re-characterization of the $500,000 took place
after the close of the fiscal year 2004 first quarter.  The
$500,000 purchase price greatly exceeded the carrying cost of

the Washington Collection inventory, and the inventory was not completely delivered to Afinsa.[4]  In addition, Escala's business combination-related expenses remained unpaid.

Specifically, on September 29, 2003, Escala invoiced Afinsa for $631,525 in business combination-related expenses, and Afinsa wired that amount to Escala on October 3, 2003.  A few weeks later, Manning told Crawford that he had sold the Washington Collection to Afinsa for $500,000.  Instead of creating a new invoice to bill Afinsa for this sale, Manning told Crawford to use a portion of the $631,525 previously received for business combination-related expenses to book the sale.

In order to do so, Crawford had to destroy a previously issued invoice and create a new one.  Crawford instructed Escala's bookkeeper as follows:  The invoice for $631,525 "should be destroyed and replaced with 2 invoices.  That invoice was in error.  Use the original invoice number for an invoice for $500,000. . . .  [T]ype on the invoice 'Invoice for all components of the Washington Collection' . . . date the [invoice] no later than September 30."  Crawford also told the

---

[4] When the Washington Collection was delivered to Afinsa's agent in the United States, the entire collection was not delivered. Manning had instructed Escala's warehouse manager not to deliver a chair that was part of the collection, and later instructed the warehouse manager to hide the chair from Escala's outside auditors.

bookkeeper to type a second invoice for $131,525 for business combination-related expenses and to give it the same date as the other invoice. He told the bookkeeper that "[t]hese bills are not to be sent to Afinsa; the bills have already been paid." On October 20, the bookkeeper responded by saying that "[t]he computer already assigned an invoice # and it cannot be used again . . . the Auditors already have all copies of billings to Afinsa as of last Thursday for the quarter . . . . What do you want me to do?" Crawford told the bookkeeper that same day to "do exactly what I asked you to do except make two new invoice numbers." Two new invoices were created and backdated to September 30, 2003.

Escala's 10-Q quarterly report for the first quarter of fiscal year 2004 (filed with the SEC on November 13, 2003) included revenues from the purported sale of the Washington Collection in the amount of $500,000 ($400,000 pre-tax net income). This amount was approximately 1.4% of Escala's first quarter revenue, 5.4% of the first quarter's gross profit, and 15% of its pre-tax net income.

E.  Discovery of the Brookman Agreement

Escala's audit committee did not learn about the existence of the Brookman Agreement until July 2004, when it was informed by Escala's in-house counsel. The auditors and audit committee

11

did not know at that time, however, that Manning set the Brookman Catalogue prices.  Concerned that the Brookman Catalogue was not independent, the audit committee required Manning to obtain independent appraisals of prices in the Brookman Catalogue.  The audit committee also updated the Management's Discussion and Analysis ("MD&A") sections of its quarterly reports as described below.

It was not until May 2006, after an internal investigation, that the Audit Committee first discovered that Manning set the prices in the Brookman Catalogue.  Manning admitted he set the prices for, <u>inter alia</u>, the UN Archive material, in a November 30, 2006 memorandum to Escala's board of directors, in-house counsel, and outside auditor.

F.  <u>SEC Disclosures and Escala Earnings Forecasts</u>

On September 12, 2003, Escala filed its annual 10-K report for its 2003 fiscal year.  That report included revenue associated with the sale of the UN Archive to Afinsa; Escala received $1.6 million from that sale in its fourth quarter of 2003.  On November 13, 2003, Escala filed its 10-Q quarterly report for the first quarter of fiscal year 2004.  That report included $500,000 in revenue associated with the purported sale of the Washington Collection materials.

Escala also filed 10-Q reports on November 8, 2004, February 9, 2005, and May 13, 2005, and a 10-K report on September 16, 2005, that included revenues from, inter alia, the sales of the UN imperforates.  Also, the revised MD&A disclosure first appeared in Escala's fiscal year 2005 second quarter report, and it stated that sales to Afinsa were at prices "generally determined with reference to prices for such material contained in catalogues that are used throughout the industry," and that "[i]n certain cases [Escala] obtains independent appraisals of such catalogue prices."  This MD&A language also appeared in the 10-Q reports filed by Escala for fiscal year 2006 on November 8, 2005 and February 9, 2006.  Escala last filed a periodic report with the SEC on March 31, 2006.

Manning signed, inter alia, six successive 10-Q quarterly reports (filed between November 13, 2003 and May 13, 2005) and three successive 10-K annual reports (filed on September 12, 2003, September 9, 2004, and September 13, 2005, as amended September 16, 2005).  Crawford signed, inter alia, eight successive 10-Qs (filed between November 13, 2003 and February 9, 2006), and two successive 10-Ks (September 9, 2004 and September 13, 2005, as amended September 16, 2005).

Escala also issued income and revenue forecasts from September 2003 to September 2004, as well as forecasts relating to its fiscal year 2004 year-end results.  Escala met five of

its net income forecasts due to income derived from the UN
Archive or Washington Collection transactions with Afinsa.  For
example, Escala estimated income between $4.8 million and $5.2
million for its 2004 third quarter, and UN Archive sales to
Afinsa brought in $5.8 million in pre-tax profits that quarter.
Escala's share price increased 18% based upon the news that it
had exceeded its forecast that quarter.  Escala also met two of
its revenue forecasts due to revenue derived for the UN Archive
or Washington Collection transactions.  For example, Escala met
its revenue forecast for fiscal year 2004; its revenue was
$212,890,000, and the UN Archive and Washington Collection
transactions with Afinsa contributed over $18 million of that
amount.  Escala's share price increased 5.3% after it met this
forecast.


DISCUSSION

     A court considering a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6) must "accept as true all
factual statements alleged in the complaint and draw all
reasonable inferences in favor of the non-moving party."
Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.,
517 F.3d 104, 115 (2d Cir. 2008) (citation omitted).  To survive
such a motion to dismiss, "a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief

                                14

that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 129 S. Ct.
1937, 1949 (2009) (quoting <u>Bell Atlantic v. Twombly</u>, 555 U.S.
544, 570 (2007)); <u>see also</u> <u>South Cherry Street, LLC v. Hennessee</u>
<u>Group LLC</u>, --- F.3d ---, No. 07-3658-cv, 2009 WL 2032133, at *5
(2d Cir. July 14, 2009) (courts are to "assum[e] all 'well-
pleaded factual allegations' to be true, and 'determin[e]
whether they plausibly give rise to an entitlement to relief'"
(citing <u>Iqbal</u>, 129 S. Ct. at 1950)).  This "plausibility
standard is not akin to a probability requirement, but it asks
for more than a sheer possibility that a defendant has acted
unlawfully." <u>Iqbal</u>, 129 S. Ct. 1949 (citation omitted).
Applying the plausibility standard is "a context-specific task
that requires the reviewing court to draw on its judicial
experience and common sense." <u>Id.</u> at 1950.

Manning has moved to dismiss certain of the claims and
allegations against him in the complaint, contending that 1) the
claim for violation of Section 10(b) of the Exchange Act and
Rule 10b-5 should be dismissed to the extent that it pertains to
the Brookman Agreement and the UN Archive sale, because the
omitted information was not material and the omissions were not
made in connection with the purchase or sale of any security; 2)
that the remedies of civil monetary penalties, permanent
injunctive relief, and an officer and director bar should be
dismissed to the extent they pertain to the Washington

Collection because those remedies are time-barred; 3) that the SEC's claim for a violation of Exchange Act Rule 13a-14 fails to state an independent claim; and 4) that the other claims in the complaint should be dismissed to the extent they pertain to the Brookman Agreement or Washington Collection for the reasons mentioned above in connection with the Section 10(b) claim. Crawford's motion to dismiss contends 1) that the Section 10(b) claim should be dismissed because the SEC has failed to plead scienter and because the Brookman Agreement was immaterial; 2) that the Washington Collection claims are time-barred; 3) that the SEC's claim for a violation of Rule 13a-14 fails to state an independent claim; and 4) that the complaint's other claims fail for essentially the same reasons as the Section 10(b) claim.[5]

A.   The Brookman Agreement and Accounting Rules

Financial statements must be reported in accordance with Generally Accepted Accounting Principles, or "GAAP." The meaning of GAAP was explored in this Court's January 13, 2006 Opinion in SEC v. KPMG, LLP, 412 F. Supp. 2d 349, 355 (S.D.N.Y. 2006), which in turn drew on the detailed discussion in this Court's January 18, 2005 Opinion deciding the summary judgment motion of Arthur Andersen LLP in In re WorldCom, Inc. Securities

---

[5] The defendants also join in each other's arguments to the extent they apply.

<u>Litigation</u>, 352 F. Supp. 2d 472, 478-79 (S.D.N.Y. 2005), and this Opinion draws in part from those previous Opinions for this discussion.

As set forth in those Opinions, the goal of financial reporting is to "provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions." Financial Accounting Standards Board ("FASB"), Statement of Financial Accounting Concepts No. 1 (1978); <u>see also</u> Statement of Financial Accounting Standards No. 168, Appendix A (June 2009). The purpose of GAAP is "to increase investor confidence by ensuring transparency and accuracy in financial reporting." <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004).

There are multiple GAAP sources, including standards issued by the FASB.[6]  FASB, an independent private sector organization,

---

[6] FASB standards sit atop the hierarchy of GAAP sources. <u>KPMG</u>, 412 F. Supp. 2d at 355.  Effective for financial statements issued for periods ending after September 15, 2009, however, the SEC is replacing the previous hierarchy with a new "FASB Accounting Standards Codification," which is "the single source of authoritative nongovernmental U.S [GAAP]" and includes all standards from A through D of the pre-codification GAAP hierarchy, including FASB standards.  <u>See</u> FASB Accounting Standards Codification Launches Today, FASB News Release, (July 1, 2009), available at http://www.fasb.org/cs/ContentServer?c =FASBContent_C&pagename=FASB%2FFASBContent_C%2FNewsPage&cid= 1176156318458&pf=true.  The Codification does not change GAAP, but it introduces a new structure.  <u>Id.</u>  Under the Codification, there are only two levels in the hierarchy: authoritative (<u>i.e.</u>,

is the "designated organization in the private sector for establishing standards of financial accounting."  FASB, Facts About FASB, available at http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495.  FASB's standards have been recognized by the SEC as authoritative.  <u>See</u> Statement of Policy on the Establishment and Improvement of Accounting Principles and Standards, SEC Release No. AS-150, 1973 WL 149263, at *1 (Dec. 20, 1973).

In the instant case, the SEC has alleged that once the parties executed the Brookman Agreement, B & W became a related party of Escala's, because both parties were under the common control of Afinsa.  Under GAAP Statement of Financial Accounting Standards No. 57, Related Party Disclosures ("FAS 57"), promulgated by the FASB, "control" is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an enterprise through ownership, by contract, or otherwise."  Appendix B to FAS 57.  The SEC alleges that the Brookman Agreement gave Afinsa control of B & W.

---

those sources included in the Codification) and non-authoritative (accounting literature not included in the Codification).  <u>Id.</u>, <u>see also</u> FASB, Statement of Financial Accounting Standards No. 168, ¶ 6 (2009).

The SEC further alleges that because both Escala and B & W were under Afinsa's common control, FAS 57 required Escala to disclose B & W as a related party.  FAS 57, ¶ 4 provides:

> If the reporting enterprise and one or more other enterprise are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, the nature of the control relationship shall be disclosed even though there are not transactions between the enterprises.

Finally, FAS 57 provides that "[t]he provisions of this Statement need not be applied to immaterial items."

As a preliminary matter, both defendants argue that it is not clear that the Brookman Agreement rendered B & W a related party under FAS 57 that was required to be reported, because the Brookman Agreement only gave Afinsa editorial control while leaving the rest of B & W's management in place.  The SEC has adequately alleged that the Brookman Agreement, which allowed Afinsa to have complete editorial control over the Brookman Catalogue, including control over pricing, preparation of descriptions, and the addition and deletion of material, gave Afinsa the power to direct B & W's management and policies such as to give Afinsa control over B & W under FAS 57.  The defendants cite to no applicable case law or other authoritative sources that establish that the SEC must allege Afinsa's total control over all aspects of B & W for Afinsa to have management

control over B & W such that FAS 57 applies.  By alleging that B & W ceded independence of the Brookman Catalogue to Afinsa, the SEC has sufficiently alleged at this pleading stage that Escala and B & W were under "common ownership or management control," and that FAS 57 required disclosure of that relationship. Afinsa's alleged control over B & W included its "possession . . . of the power to direct . . . the management and policies of [B & W] through . . . contract."

B.  <u>Section 10(b) and Rule 10(b)(5)</u>

Section 10(b) creates civil liability for those who "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), imposes liability on those who "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact or [ ] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or "engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To establish liability under Section 10(b), a plaintiff must prove that "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996); see also South Cherry, 2009 WL 2032133, at *9.

Section 10(b) claims therefore sound in fraud, and must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) by "stating with particularity the circumstances constituting fraud." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). The rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted). The SEC has alleged that defendants violated Section 10(b) and Rule 10b-5 by, inter alia, failing to disclose the existence of the Brookman Agreement and the fact that it rendered B & W a related party that was required to be disclosed under FAS 57, and by failing to disclose the revenues

21

obtained by Escala as a result of Manning and Afinsa's control over prices in the Brookman Catalogue.

### 1. Materiality

The test for materiality is the well-established standard articulated in Basic Inc. v. Levinson, 485 U.S. 224 (1988), which requires proof that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Id. at 231-32 (citation omitted); see also ECA, 553 F.3d at 197.  "Therefore, the determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances." ECA, 553 F.3d at 197.

Materiality is a mixed question of law and fact that should generally be presented to the jury.  Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186 F.3d 157, 172 (2d Cir. 1999).  Thus, in the context of a motion to dismiss, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  ECA, 553 F.3d at 197 (citation omitted).  "An omitted fact may be immaterial if the information is trivial, or

is so basic that any investor could be expected to know it."
Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir.
2000) (citation omitted).[7]

Materiality has both a quantitative and a qualitative
component, ECA, 553 F.3d at 204, and it is error to rely
exclusively on a single numerical or percentage benchmark to
determine materiality.  Ganino, 228 F.3d at 162.  The Second
Circuit has used SEC Staff Accounting Bulletin No. 99, 64 Fed.
Reg. 45150, 45150-52 (1999) ("SAB 99"), as "persuasive guidance"
for evaluating the materiality of a misrepresentation.  Ganino,
228 F.3d at 163.  SAB 99 sets forth several qualitative factors
to be considered in evaluating materiality, including, inter
alia: "[w]hether the misstatement masks a change in earnings or
other trends," "[w]hether the misstatement hides a failure to
meet analysts' consensus expectations for the enterprise,"
"[w]hether the misstatement changes a loss into income or vice
versa," and "[w]hether the misstatement involves concealment of
an unlawful transaction."  SAB 99, 64 Fed. Reg. at 45,152.  SAB
99 also warns registrants that they

> should not assume that even small intentional
> misstatements in financial statements, for example
> those pursuant to actions to "manage" earnings, are
> immaterial.  While the intent of management does not

_____

[7] The Second Circuit has also interpreted the standard for
materiality for FAS 57 purposes as being the same as the
standard for materiality for Section 10(b) and Rule 10b-5
purposes.  See ECA, 553 F.3d at 202 n.8.

> render a misstatement material, it may provide
> significant evidence of materiality.  The evidence
> may be particularly compelling where management has
> intentionally misstated items in the financial
> statements to "manage" reported earnings.  In that
> instance, it presumably has done so believing that
> the resulting amounts and trends would be
> significant to users of the registrant's financial
> statements.

Id. (citation omitted).

SAB 99 also speaks to the quantitative analysis, and notes that "[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material."  SAB 99, 64 Fed. Reg. at 45,151; see also ECA, 553 F.3d at 204 (noting that Ganino had found that an "alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law").  The preliminary quantitative analysis must be supplemented, however, with reference to the qualitative factors "that might contribute to a finding of materiality."  ECA, 553 F.3d at 204.

### a. B & W and the Brookman Agreement

The SEC has sufficiently alleged the materiality of the omission from the SEC's public filings of the fact that B & W was a related party because it was under Afinsa's control.

Escala's public filings reflected revenue from the sale of,
inter alia, the UN Archive material to Afinsa.  For example,
Escala's 10-K for fiscal year 2003, filed September 12, 2003,
reflected $1.6 million in revenue from that sale in the fourth
quarter.  By the time of this filing, B & W was a related party
of Escala by virtue of the Brookman Agreement.  Escala's failure
to disclose B & W as a related party, and the fact that the
price for the UN Archive sale from Escala to Afinsa was not
based on independent valuations of the sold material, but rather
was sold at the same time Afinsa was in the process of acquiring
control over B & W such that it could control the valuation of
that material, was important information for investors who
wanted to evaluate the revenue stream reported by Escala from
the UN Archive sale.  A jury could find that a reasonable
investor would find that it altered the total mix of available
information to know that the sale price of the UN archive
material was set in circumstances in which Afinsa was going to
have control over the catalogue that would set the value for
that material, and therefore did not reflect an independent
valuation of the revenue stream Escala gained from the sale.

The defendants principally attack this conclusion by
arguing that the related party status of B & W was immaterial by
virtue of the fact that Escala had already disclosed that it was
related to Afinsa, and thus investors already knew that the

25

price of the UN Archive sale between Escala and Afinsa was not a
completely independent transaction.  They argue that disclosing
the related party status of B & W would add nothing of
importance to what was already disclosed.

That investors knew that the transaction between Escala and
Afinsa was between related parties, however, does not mean that
they knew that the prices for Escala's stamp sales to Afinsa
were based not on values independently derived, but were instead
based on values that Afinsa knew it could control.  Without this
additional information, as discussed above, investors looking to
evaluate the soundness of Escala's business could not adequately
evaluate the Escala sales to Afinsa and what they meant in terms
of Escala's legitimate revenue and prospects.  The importance of
this information regarding the lack of independence of the
prices to investors can be seen in the fact that the audit
committee, once it learned of the Brookman Agreement, updated
Escala's MD&A disclosure to assure investors and the public, as
it turned out allegedly falsely, that the sales of stamps from
Escala to Afinsa were based on independent prices from industry
catalogues and appraisals.  This supports the inference that the
fact that the revenue Escala made from the UN Archive sale was
based on a price that was set knowing that Afinsa would have
control over setting the value of the stamps was of importance
to a reasonable investor and therefore material.

Similarly, Manning contends that the information regarding B & W was not required to be disclosed because the SEC has not alleged how Escala's operating results or financial position would have been different from a situation in which B & W remained autonomous.  FAS 57, ¶ 4.  Specifically, Manning argues that the Brookman Agreement was not formally signed until after the UN Archive sale closed, and the Brookman Catalogue was not actually published until some time thereafter, and thus the fact of Escala and B & W being related parties could not have affected the sale price of the stamps to Afinsa.

The SEC has adequately pleaded, however, that Escala and Afinsa knew of Afinsa's anticipated control of the Brookman Catalogue before the Brookman Agreement was actually signed and before the catalogue was actually published, and that this impacted the setting of the UN Archive sale price.  For example, the SEC pled that before Escala had even acquired the UN Archive stamps, Manning had told Afinsa of his plan to acquire the stamps and then raise their values in the catalogue that Afinsa would control.  Therefore, the price of the Escala/Afinsa UN Archive sale was set under circumstances in which Escala and Afinsa knew that Afinsa would be able unilaterally to control the value of those stamps.  Furthermore, on the day of the UN Archive sale to Afinsa, Manning told Afinsa that he would be increasing the value of the stamps in the Brookman Catalogue.

In addition, the SEC has pleaded that the Brookman Agreement was
drafted by Escala, further demonstrating that Afinsa's control
over pricing was known before the actual Brookman Agreement was
signed.  Thus, the complaint sufficiently pleads the UN Archive
sale and the Brookman Agreement as essentially contemporaneous
business transactions, and as such, sufficiently pleads that the
sale price of the UN Archive was influenced by Afinsa's
impending control over the value of the goods sold.  These
allegations are sufficient to plead that Escala's financial
position was significantly affected by virtue of B & W's related
party status, and that the failure to disclose the B & W
information was material.  Thus, the defendants' motions to
dismiss on this ground are denied.

        b.   The Washington Collection

    Crawford argues briefly that the Washington Collection
transaction was immaterial.  He cites only the allegation in the
complaint that the revenue generated from the Washington
Collection in the first quarter of fiscal year 2004 was
approximately 1.4% of Escala's revenue, 5.4% of gross profits,
and approximately 14 percent of pre-tax net income, and argues
that in light of Escala's total financial numbers these numbers
are "miniscule."

The SEC has adequately alleged the materiality of the Washington Collection transaction.  Under the quantitative analysis, it is not apparent that these financial figures render the transaction presumptively immaterial, especially given the fact that the transaction made up 14% of the quarter's pre-tax net income.  In addition, Crawford neglects to address the qualitative side of the materiality inquiry.  That inquiry, as discussed above, includes looking at whether, for example, the transaction masks a change in earnings or whether the misstatement changes a loss into income or vice versa.  Here the SEC has alleged that defendants took an outstanding debt that was owed by Afinsa for business combination-related expenses and re-characterized most of that debt as income from a sale of inventory.  In addition, the SEC has alleged that defendants did so intentionally to get the inventory off of Escala's books, which provides additional evidence of materiality.  On the whole, the SEC has sufficiently alleged at this stage that a reasonable investor would have wanted to know that the revenue from the purported sale of the Washington Collection was not actually revenue from a sale, and that the inventory, which had been on Escala's books for years because Escala had been unable to sell it, was not actually sold in a bona fide sale.  The defendants' motions to dismiss on this ground are denied.

2.   "In Connection With" Requirement

Manning contends that the SEC has not adequately pled that the violative conduct at issue was "in connection with" the purchase or sale of securities as required to state a claim under Section 10(b).  The requirements of Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes."  SEC v. Zandford, 535 U.S. 813, 819 (2002) (citation omitted).  As such, the requirement in Section 10(b) that the fraudulent conduct be in connection with the purchase or sale of any security has been liberally construed.  See, e.g., id. at 819-20.  Nevertheless, "the incidental involvement of securities d[oes] not implicate the anti-fraud provisions of the federal securities laws."  Pross v. Katz, 784 F.2d 455, 459 (2d Cir. 1986) (citing Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir. 1984)).

In In re Ames Department Stores Inc. Stock Litigation, 991 F.2d 953 (2d Cir. 1993), the Second Circuit found that misleading information in prospectuses and public filings met the in connection with requirement because they were "precisely the sort of documents which a reasonable investor would consider in evaluating a company's prospects."  Id. at 965.  The Ames court relied in part on Ross v. A.H. Robins Co., Inc., 607 F.2d 545 (2d Cir. 1979), which it found had "recognize[d] that statements directed to the general public which affect the

30

public's interest in the corporation's stock are made in connection with sales or purchases of that stock." Ames, 991 F.2d at 966.  Following these principles, courts in this district have routinely found that misrepresentations or omissions in quarterly and annual public filings with the SEC meet the "in connection with" requirement.  See, e.g., SEC v. Solucorp Indus., Ltd., 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003); SEC v. DCI Telecomms., Inc., 122 F. Supp. 2d 495, 499-500 (S.D.N.Y. 2000); SEC v. Schiffer, No. 97 Civ. 5853(RO), 1998 WL 307375, at *2-3 (S.D.N.Y. June 11, 1998); SEC v. Softpoint, Inc., 958 F. Supp. 846, 862-63 (S.D.N.Y. 1997) (Sotomayor, J.).

The SEC has alleged that Escala's quarterly and annual reports that were filed with the SEC contained material omissions and misrepresentations.  As these are the types of documents on which a reasonable investor would rely in evaluating Escala's prospects, the SEC has adequately alleged that the violative conduct in this case was in connection with the purchase and sale of securities.

Manning argues that the omissions in these filings do not satisfy the requirement because they do not have direct pertinence to the purchase or sale of Escala securities and do not relate to the value, nature or investment characteristics of the securities at issue.  As discussed above in relation to the materiality requirement, however, the SEC has adequately alleged

31

that the failure to disclose the related party transactions was material to an investor's ability to evaluate the revenue stream being generated from Escala's sales of stamps to Afinsa.  As such, the SEC has adequately alleged that the omitted information was directly pertinent to Escala's stock and was related to its value and investment characteristics.[8]


    3.  Scienter

    Crawford alleges that the SEC has not adequately pled the required element of scienter as to him.  "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5 . . . is an intent to deceive, manipulate, or defraud."  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citation omitted).  To plead scienter, "the complaint must allege facts giving rise to a strong inference of fraudulent intent."  South Cherry, 2009 WL 2032133, at *9 (citation omitted).  To do so, a plaintiff may "(1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that the defendants

---

[8] The district court decisions on which Manning principally relies in making this argument, e.g., Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 242 (S.D.N.Y. 2006) and Production Resource Group, L.L.C. v. Stonebridge Partners Equity Fund L.P., 6 F. Supp. 2d 236, 239-40 (S.D.N.Y. 1998), are inapposite.

had both motive and opportunity to commit fraud."[9] Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004) (citation omitted); see also South Cherry, 2009 WL 2032133, at *9-10.

"It is well-settled that knowledge of the proscribed activity is sufficient scienter under § 10(b)." SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998); see also Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (conscious misbehavior "encompasses deliberate illegal behavior"). Recklessness, meanwhile, requires "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, 553 F.3d at 198 (citation omitted).

> [S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

Kalnit, 264 F.3d at 142 (citation omitted).

In ECA, 553 F.3d 187, the Second Circuit discussed scienter where the claim was that the defendant failed to disclose related party transactions in violation of FAS 57.  The court first noted that "[a]llegations of GAAP violations or accounting

---

[9] The SEC does not argue that it has alleged facts sufficient to plead scienter under the motive and opportunity theory.

irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  Id. at 200 (citation omitted).  Moreover, the plaintiff needed "to allege facts showing that [defendant's] transactions with [the related party] were 'material,' because the disclosure requirements of SFAS 57 only relate to material related-party transactions."  Id. at 202.

The SEC's allegations in the instant complaint adequately plead Crawford's scienter.  The SEC has alleged that Crawford, a licensed CPA, knew of the existence of the Brookman Agreement and that therefore B & W was a related party, knew that Manning set the initial prices in the Brookman Catalogue, and knew of the obligation to disclose related parties but deliberately failed to do so.  Unlike the plaintiff in ECA, the SEC has adequately alleged that this omission was material, as discussed above, and thus the SEC has sufficiently pled that Crawford knew of the duty to report B & W as related, and intentionally failed to do so.

Crawford cites to Chill v. General Elec. Co., 101 F.3d 263, (2d Cir. 1996), for the proposition that "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."  Id. at 270.  The facts the SEC has

pled, however, allege more than just a violation of GAAP and FAS 57 without corresponding intent; they allege a knowing violation of the reporting requirement, which supplies the necessary inference of fraudulent intent.  Similarly in Kalnit, the Second Circuit found that scienter had not been alleged under the conscious misbehavior theory where the duty to disclose was not clear, and thus recklessness could not be inferred.  264 F.3d at 143.  Here, however, the SEC has adequately alleged at this stage of the proceedings that Crawford knew that B & W was a related party that was required to be disclosed under FAS 57.

Crawford also argues that the SEC has failed to plead scienter because the SEC has failed to allege that Crawford had any knowledge of Afinsa's ponzi scheme, and more generally has not alleged any motive for Crawford's participation in this fraud.  As discussed above, however, the SEC can sustain its burden of proving scienter even in the absence of proof of Crawford's motive, and as such the claims cannot be dismissed for lack of scienter.  See KPMG, 412 F. Supp. 2d at 382.

Crawford also argues that the SEC has not pled the required scienter because, inter alia, Crawford "deferred" to the judgment of in-house counsel for Escala, who knew of the Brookman Agreement and did not disclose it to the audit committee.  While Crawford may be able to show at trial that he

acted in good faith, the SEC's allegations of scienter are sufficient to withstand his motion to dismiss.[10]


B.   <u>Statute of Limitations and the Washington Collection</u>

Defendants contend that the allegations relating to the Washington Collection do not fall within the five-year limitations period set forth in 28 U.S.C. § 2462,[11] and therefore are time-barred.[12]   The SEC responds by arguing 1) that it adequately pled that the improper accounting of the Washington Collection was contained in the fiscal year 2004 financial statements, some of which were filed within the five years preceding the filing of the complaint, such that the Washington Collection allegations are not time-barred, and 2) that even if

---

[10] To the extent that Crawford is contending that the complaint failed to plead scienter in relation to the Washington Collection allegations, the motion is denied as well.  The complaint alleges that Crawford directed the bookkeeper to destroy old invoices and create new ones to improperly designate the reason for the payment from Afinsa.  These actions demonstrate strong circumstantial evidence of conscious misbehavior.

[11] 28 U.S.C. § 2462 provides: "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."

[12] Crawford appears to contend that all of the Washington Collection allegations are time-barred, whereas Manning appears to argue that the following remedies are time-barred pursuant to 28 U.S.C. § 2462: civil penalties, a permanent injunction against future securities laws violations, and the officer/director bar.

the allegations fall outside the five-year period set forth in
28 U.S.C. § 2462, only the remedy of civil penalties would be
time-barred.

The SEC is granted leave to amend the complaint to plead
with particularity the specific representations or omissions it
contends were in violation of the federal securities laws that
were made within the statute of limitations period.  Having
granted the SEC leave to replead on this issue, it is premature
to decide the legal question addressed by the parties as to
which of the remedies the SEC seeks, if any, would be precluded
by the statute of limitations having run.  Thus, this branch of
the defendants' motions is denied without prejudice to renewal
at the appropriate time.


C.  Other Securities Law Violations

The defendants argue that for essentially the same reasons
the Section 10(b) claim should be dismissed, i.e. the SEC's
failure to plead materiality as argued by Manning and the SEC's
failure to plead scienter and materiality as argued by Crawford,
the complaint's books and records claims and aiding and abetting
claims (claims two through six) should also be dismissed for
failure to state a claim under the applicable standards.
Because, as discussed above, the SEC has adequately pled the
materiality of the violative conduct and Crawford's scienter,

37

the defendants' motions to dismiss these claims are also
denied.[13]


D.  Exchange Act Rule 13a-14

In the instant motion papers, the parties debate the issue
of whether a violation of Exchange Act Rule 13a-14 can be pled
as an independent claim.  Because resolution of this issue will
not impact the course of discovery in this litigation, this
issue will not be addressed at this time.  The defendants'
motions to dismiss this claim are therefore denied without
prejudice to renewal at an appropriate time.


CONCLUSION

Defendant Gregory Manning's and Larry Lee Crawford's May
19, 2009 motions to dismiss are both denied.  The SEC may amend
their complaint as to the Washington Collection allegations as

---

[13] To the extent defendants have moved to dismiss the allegations
in these other claims that relate to the Washington Collection
because they are time-barred, the SEC has been granted leave to
amend its complaint relating to the Washington Collection as
discussed in the previous section, and therefore this ground of
the defendants' motions is denied without prejudice.

discussed above by August 30, 2009.


     SO ORDERED:

Dated:    New York, New York
          July 31, 2009

                            DENISE COTE
                  United States District Judge